**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO. 12-cv-00595-UA-SPC**

TAYLOR, BEAN & WHITAKER MORTGAGE
CORP., et al.,

    Plaintiffs,

vs.

LENNAR CORPORATION, a Delaware
Corporation, et al.,

    Defendants.
_____/

**BERGER SINGERMAN LLP'S SUR-REPLY REGARDING**
**MOTION TO DISQUALIFY COUNSEL FOR PLAINTIFF (DOC. #18)**

Berger Singerman LLP hereby files its Sur-Reply in opposition to Defendants Lennar Corporation and U.S. Home Corporation's Motion to Disqualify Counsel for Plaintiff, Taylor, Bean & Whitaker Mortgage Corp. (Doc. #18).

## I. INTRODUCTION

To be clear, Berger Singerman did not drop Lennar Homes and Lennar Corp. as clients. Lennar Corp. unceremoniously dumped the firm in 2009. In 2010, Lennar Homes told the firm to stand down on its remaining two matters. Any claim to the contrary is simply untrue.

Lennar Corp. initially retained the firm in September 2007, and the firm represented it on several matters into 2009. **Ex. 1** at ¶ 3 [Supp. Berger Decl.]. However, those matters all ended by October 2009, and Lennar Corp. did not ask the firm to represent it in any new matters. *Id.* The firm continued to represent Lennar Homes in two matters involving JB Ranch Associates (the "JB Ranch Matters"). **Ex. 2** at ¶ 5 [Supp. Carriuolo Decl.]. The first was a contract dispute relating to a development venture with JB Ranch (the "JB Ranch Litigation"). *Id.* at ¶ 3. The

second was a foreclosure action against the same property (the "JB Ranch Foreclosure"). *Id.* at ¶ 4. After the JB Ranch Foreclosure was filed, Lennar Homes told the firm to take no action in the JB Ranch Litigation. *Id.* at ¶ 4.

In October 2010, while the firm was already following Lennar Homes' instruction to take no action in the JB Ranch Litigation, Lennar Homes decided not to contest the foreclosure case and directed the firm to stand down in that case as well. *Id.* at ¶ 8. Thus, from October 2010 until July 2012, Lennar Homes did not ask the firm to perform substantive work in the JB Ranch Matters. *Id.* Without the firm's knowledge or involvement, Lennar Homes negotiated a settlement of the JB Ranch Foreclosure. *Id.* at ¶¶ 8-9.

Thus, at the time that Berger Singerman appeared in this case, Lennar Corp. had abandoned the firm as its counsel over three years earlier, and Lennar Homes had asked the firm to stand down on its two matters. Lennar Corp.'s attempt to turn the facts around and argue that it was the firm that did the dumping should be rejected.

## II. UNDISPUTED ISSUES

Lennar Corp. does not dispute, and thus admits, the following facts that the firm raised in its Response (Doc. #43), which are fatal to the Motion to Disqualify:

- That the firm stopped representing Lennar Corp. in any matters in 2009;

- That this Case is unrelated to any matter in which the firm represented Lennar Corp. or Lennar Homes;

- That, in October 2010, Lennar Homes instructed the firm to stand down in the JB Ranch Foreclosure matter;

- That the firm no longer represents Lennar Homes in the JB Ranch Foreclosure;

- That the firm did not obtain any confidential information that could be used against Lennar Corp. here; and

- That Lennar Corp. knew in September 2009 that the firm was involved in the TBW Bankruptcy and in August 2011 that the firm represented the Plan Trustee.

### III.  THERE IS NO BASIS TO DISQUALIFY BERGER SINGERMAN

As set forth in the firm's Response and exhibits, as well as in this Sur-Reply and the supplemental declarations of Mr. Pera, Mr. Berger, Mr. Singerman, and Mr. Carriuolo attached hereto, the Motion to Disqualify should be denied.

### A.  The "Hot Potato" Rule Does Not Apply Here.

Much of Lennar Corp.'s Reply and the accompanying, colorful report of Lawrence J. Fox (the "Fox Report") focuses on their new argument that the "hot potato" rule prevents the firm from dropping Lennar Homes to pursue a "more lucrative" engagement. No amount of spin can mask the simple truth: the firm got dumped. The "hot potato" rule has no place here.

Berger Singerman's Response detailed Lennar Corp.'s initial engagement of the firm in 2007, Lennar Corp.'s decision in 2009 not to use the firm, Lennar Homes' repeated instructions to the firm not to take any action in the two JB Ranch Matters, and Lennar Homes' settlement negotiations in the JB Ranch Foreclosure without the firm's involvement or even knowledge. These facts – which Lennar Corp. does not dispute – demonstrate that it was Lennar Corp. and Lennar Homes which abandoned Berger Singerman, and not the other way around. That fact alone defeats Corp.'s "hot potato" argument.

Lennar Corp.'s only response is that the firm continues to represent Lennar Homes in the JB Ranch Litigation.[1] However, there is no dispute that, even though the JB Ranch Litigation has not officially been dismissed and closed yet, as a practical matter, the settlement in the JB Ranch Foreclosure has rendered it moot. **Ex. 2** at ¶ 13.

---

[1] A final judgment has been entered in the JB Ranch Foreclosure. **Ex. 2** at ¶ 13.

Contrary to Lennar Corp.'s claim, the fact that the two JB Ranch Matters were dormant and near resolution is highly relevant. It is because of the posture of those two cases that Lennar Homes instructed Berger Singerman not to perform any substantive work on those cases. Thus, for nearly two years, the firm performed minimal, ministerial services (*e.g.,* "update status report"). For both JB Ranch Matters, from October 15, 2010 through May 2012, the firm billed a total of 8.8 hours, less than half an hour per month for the two cases combined. *Id.* at ¶ 8.

Under Florida law, providing such ministerial work does not qualify as a current representation. *See Yang Enterps., Inc. v. Georgalis*, 988 So. 2d 1180 (Fla. 1st DCA 2008) (holding that corporation was a former client despite receiving two cover letters and a bill from the firm because ministerial work does not meet the definition of a current representation). Similarly, the court in *Melville Capital, LLC v. Tenn. Commerce Bank* denied a motion to disqualify where the firm performed ministerial services for the putative client. *See* No. 3:11-cv-00888, 2011 WL 6888526, at *3-5 (M.D. Tenn. Dec. 29, 2011). The court reasoned that, first, the movant had not shown that it was a current client of the firm, even though the firm was its counsel of record in a bankruptcy matter. Second, the court found that the general prospective conflict waiver was valid and enforceable because the movant was sophisticated and represented by outside counsel. Finally, the movant conceded that there was no risk of confidential information being shared and that the two matters were not substantially related. *Id.*

Likewise, in *In re Jet 1 Ctr., Inc.*, 310 B.R. 649, 653 (Bankr. M.D. Fla. 2004), the court rejected a "hot potato" argument and denied a motion to disqualify where the attorney was not actively representing the movant when he accepted the new matter. In *Jet 1*, a bank held a security interest on the debtor's interest in an airport operated by the Naples Airport Authority ("NAA"). The bank moved to disqualify counsel for the NAA because he had represented the

4

bank for many years. *Id.* at 651. Prior to the bankruptcy, the NAA, with Amato as its counsel, sued the debtor for violating certain lease covenants. *Id.* At no time had the bank challenged the lawyer's right to represent the NAA in that case. *Id.* at 652. Counsel then appeared in the bankruptcy case for the NAA to contest the bank's security interest. In response to the bank's request for the attorney to withdraw as counsel for the NAA, the attorney resigned from representing the bank. *Id.* The court found that the "hot potato" rule did not apply:

> There are no multiple representations at all in the present instant and this is not the case where Amato was actively representing the Bank in pending litigation when he accepted the employment with NAA. When the Bank challenged his right to represent NAA, Amato resigned his active representations. Thus, this is not a "hot potato" case unlike the case in *Harte.*[2]

*Id.* at 653. As in *Jet 1*, the firm did not actively represent Lennar Homes when it appeared here.[3]

Faced with the unhelpful facts that Lennar Corp. had dumped the firm and Lennar Homes had instructed the firm to stand down, Lennar Corp. tries to save its "hot potato" argument by claiming that the firm stated that TBW would be a "more lucrative" engagement. Despite Lennar Corp.'s and Mr. Fox's repeated use of quotation marks — which notably do not appear in Ms. Getelman's own declaration — the firm never stated that it was opting for a "more lucrative" engagement. **Ex. 3** at ¶ 10 [Singerman Decl.]. Rather, in discussing why there was no conflict, Mr. Singerman explained that Lennar Corp. had not used the firm since 2009 and Lennar Homes had stopped using the firm in the JB Ranch Matters. Any discussion of fees was to demonstrate that Lennar Corp. and Lennar Homes had not been utilizing the firm's services. *Id.*

---

[2] Lennar Corp. cites to *Harte Biltmore Ltd. v. First Pa., N.A.*, 655 F. Supp. 419 (S.D. Fla. 1987), in which a firm abandoned its client during an active litigation, and the court applied the outdated appearance of impropriety standard, and to *Harrison v. Fisons Corp.*, 819 F. Supp. 1039 (M.D. Fla. 1993), in which a firm actively represented opposing parties *in the same lawsuit*. Those facts simply do not compare.

[3] *See also Metro. Life Ins. Co. v. Guardian Life Ins. Co. of Am.*, No. 06-5812, 2009 WL 1439717 (N.D. Ill. May 18, 2009) (did not apply "hot potato" rule where representation was sporadic and non-litigious).

Lennar Corp. also cites *ValuePart, Inc. v. Clements*, No. 06-cv-2709, 2006 WL 2252541 (N.D. Ill. Aug. 2, 2006), for the proposition that withdrawal renders a client a former client only if it meets two requirements: (1) it occurs at a time when the lawyer and the client had contemplated the end of the representation; and (2) the lawyer's primary motivation for withdrawal was not his desire to represent the new client. There are no reported cases applying the *ValuePart* standard, and the reason for that is simple. Applying such a standard would mean that a lawyer could never withdraw in the middle of a representation for any reason because the end of the representation would not have been "contemplated" by the lawyer and the client. That decision is contrary to the conclusion in *Jet 1 Ctr.*

Contrary to Lennar Corp.'s assertion, the firm's withdrawal was proper under Rule 4-1.16, which provides that "a lawyer may withdraw from representing a client if . . . [it] can be accomplished without material adverse effect on the interests of the client . . ." The court in the JB Ranch Foreclosure approved the firm's withdrawal after hearing argument on whether there would be a material adverse effect on Lennar Homes. **Ex. 5** [11/8/12 Hrg.]. The hearing on the motion to withdraw in the JB Ranch Litigation is set for February 6, 2013. Further, in compliance with 4-1.16(d), the firm offered to help transition the matter to new counsel. Lennar Homes did not request any such help. *Id.* Accordingly, withdrawal was proper.[4]

## B.   Lennar Corp. Waived Any Purported Conflict.

### 1.   The prospective conflict waivers are valid and enforceable.

Mr. Fox, based on his personal view that advance waivers are "unseemly," advocates that

---

[4] Lennar Corp. attempts to distinguish the subsequent *McKesson* order but ignores the court's conclusion that the order granting the firm's withdrawal was "res judicata as to any issues that might have been raised concerning alleged abandonment or improper withdrawal, and establishes that [the law firm] did not improperly terminate or prematurely abandon its attorney-client relations . . ." **Resp. Ex. 12** at 6.

prospective waivers should be invalid unless they are very narrow and specific. Fox Rpt. at 11-19, 25. Accordingly, Lennar Corp. asserts that the five prospective waivers signed by its Deputy General Counsel do not constitute informed consent. Mr. Fox's views are not shared by the ABA or the vast majority of state bar associations and state supreme courts (including The Florida Bar and the Florida Supreme Court) and are not reflected in applicable case law. In short, Mr. Fox's unique perspective, while fascinating, is not the law.

By agreeing to the waiver, Lennar Corp. repeatedly gave its informed consent to the purported conflict it now raises. Florida law is clear that general prospective conflict waivers are enforceable, particularly where the client is sophisticated and had independent counsel to review the agreement. In *General Cigar Holdings, Inc. v. Altadis, S.A.*, the court found that a future waiver was effective because it was obtained from knowledgeable and sophisticated parties, and outside counsel and the representatives of the corporation reviewed the engagement letter. 144 F. Supp. 2d 1334, 1339 (S.D. Fla. 2001).[5] Here, the client, Lennar Corp., was sophisticated, and the client was represented by its own independent counsel. By his own admission, Lennar Corp.'s Deputy General Counsel who reviewed and signed the engagement letters with Berger Singerman is highly experienced in entering into such agreements.

Mr. Fox's argument that *General Cigar* was decided before the Florida Supreme Court adopted the Ethics 2000 changes is to no avail. *Id.* He argues that, while the Court adopted many of the Commission's comments to Rule 4-1.7, it did not adopt ABA comment [22], which provides that an open-ended prospective waiver may be enforceable against sophisticated clients. *Id.* It is Mr. Fox's position that the Court's omission "speaks volumes" as to its opinion on such waivers because it came after *General Cigar. Id.* Contrary to Mr. Fox's claim that the Court

---

[5] Inexplicably, Mr. Fox states that the firm "ignor[ed] the lessons of *General Cigar.*" Fox Rpt. at 22.

somehow rejected *General Cigar* by not adopting comment [22], The Florida Bar's Special Committee explained that it "decline[d] to recommend adoption of the ***vast majority*** of the changes" to the comments because "the additions made by the ABA are already covered in existing Florida authority such as ***case law*** and ethics opinions." **Ex. 6** at 15 [Pet. to Amend Rules] (emphasis added). Of course, that case law includes *General Cigar*.[6]

Lennar Corp. cites to *Celgene Corp. v. KV Pham. Co.*, No. 07-cv-4819, 2008 WL 2937415 (D.N.J. Jul. 29, 2008), in support of its claim that, despite the advice of its experienced, independent counsel, it did not give "truly informed consent". The *Celgene* court recognized that "consent that is informed but general is likely to be valid if the client was represented by independent counsel in the waiver transaction" but found the waiver invalid because the firm did not consult on it with the client. 2008 WL 2937415, at *10, *11. Here, Mr. Berger's declaration[7], which Lennar Corp. does not dispute, stated that "Mr. Marlin discussed the advance conflict waiver provisions with the firm prior to signing the first engagement letter." **Resp. Ex. 2** at ¶ 5. And unlike the New Jersey rules applicable in *Celgene*, under the Florida Rules, "a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent." R. Reg. Fla. Bar Ch. 4, Preamble cmt.

Lennar Corp. asserts that the firm cannot rely on the prospective waiver in the

---

[6] In *Melville Capital*, the court concluded that a general prospective conflicts waiver was valid and enforceable. 2011 WL 6888526, at * 6. The court concluded that, "[a]s a sophisticated commercial entity that had the benefit of representation by outside counsel . . . TCB should, therefore, be deemed to have consented to [the firm's] representation of Plaintiff in this instance." *Id.* That conclusion is consistent with *General Cigar* and the Florida rules.

[7] Lennar Corp. argues that the firm admitted that the engagement letters were signed without questions, comments or discussions about any of the terms, including the prospective conflict waiver. Reply at 15. Mr. Fox goes so far as to say that "there was no conversation with the client. None whatsoever." Fox Rpt. at 18. They are wrong. Mr. Berger discussed the waiver with Mr. Marlin, who then signed the engagement letter without ***further*** discussion about the terms. **Resp. Ex. 2** at ¶ 5 (emphasis added).

engagement letters because the firm previously sought contemporaneous waivers when "faced with prior conflicts." Reply at 14 n.11. In fact, the only "prior conflict" that Lennar Corp. identifies relates to the representation of a party adverse to *Lennar Homes*, not Lennar Corp. Mot. at 6. It makes perfect sense that the firm would seek a waiver from *Lennar Homes* – the firm had not obtained a prospective waiver from Lennar Homes. Indeed, Lennar Corp. makes this point in its Motion. *Id.* at 21 (asserting that Lennar Homes is not covered by the Lennar Corp. engagement letters). The fact that the firm properly sought a waiver from Lennar Homes has no bearing on the validity of the prospective waiver by Lennar Corp.

Finally, although Mr. Fox recites the R. Reg. Fla. Bar definitions on "informed consent confirmed in writing," he omits the comment to the terminology section on "informed consent" in those same rules. The reason for the omission is clear – the comment provides that a client who is independently represented by other counsel is *assumed* to have given informed consent:

> [R]elevant factors include whether the client or other person is experienced in legal matters generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent. Normally, such persons need less information and explanation than others, and *generally a client or other person who is independently represented by other counsel in giving the consent should be assumed to have given informed consent.*

R. Reg. Fla. Bar Ch. 4, Preamble (emphasis added). The waivers here were signed by a sophisticated client's experienced and independent counsel. They are valid.[8]

### 2. The purported conflict of interest is waiveable.

Lennar Corp. and Mr. Fox assert that a client cannot waive a conflict where the attorney is asserting claims of fraud against the client. At best, Lennar Corp. has cited limited authority that

---

[8] Under the D.C. Bar ethics opinion that Lennar Corp. cites, an advance general waiver by a client with independent counsel is *presumed valid*, which is consistent with the comment to the definition of "informed consent." Indeed, such waivers are common and used by Lennar Corp.'s own counsel here, Greenberg Traurig. **Ex. 4** at ¶ 18 [Pera Suppl. Rpt.].

allegations of fraud *might*, in some situations, limit the attorney's ability to represent the client in the other case. Lennar Corp. cites no case to support that such allegations create a non-waiveable conflict. Lennar Corp. relies on *General Cigar* in its Motion, which hypothetically states that "allegations of fraud in the unrelated suit" against a current client "*may* hinder an attorney's ability to adequately represent the client in the other action." 144 F. Supp. 2d at 1340 (emphasis added). Notably, the court did not find that a conflict involving allegations of fraud actually presented an unwaiveable conflict.[9]

Moreover, Lennar Corp. and Mr. Fox both ignore the New York City Bar Association ethics opinion cited in the firm's Response, which provides that a sophisticated client can consent to its own lawyer bringing fraud claims against it. Resp. at 20.

### 3.  Lennar Corp.'s Motion is untimely.

This case, including the fraud claim, has been pending for over four years. Indeed, the facts underlying the Motion existed, at the latest, in May 2012 when the firm appeared in this Case on behalf of the Plan Trustee with Lennar Corp.'s full knowledge and acquiescence. Lennar Corp. claims that no conflict existed until July 20, 2012, because, until then, the firm was appearing "in some unknown capacity on behalf of the 'Plan Trustee,'" who was not at that time a plaintiff asserting claims directly against Lennar Corp. To the contrary, the notice of appearance identified the firm as "counsel for *Plaintiff*, Neil Luria, as Plan Trustee of Taylor Beach & Whitaker Mortgage Corp. Plan Trust." **Resp. Ex. 5** [Stip.] (emphasis added). The accompanying joint stipulation for the continuance of the case management conference, signed by Lennar Corp.'s own counsel, also expressly refers to the Plan Trustee as "Plaintiff," as does

---

[9] Lennar Corp. incorrectly states that the firm "suggests that *General Cigar* involved allegations of potentially felonious action and argues that those claims are no different from allegations of fraud." Reply at 17. Although such an argument could be made, the firm has not done so.

the resulting order. *Id.* Any assertion that the firm's role was unclear is not credible.

### D. There is No Conflict With Respect to Lennar Homes' Employees.

Lennar Corp. asserts that the firm's representation of the Plan Trustee in this Case is directly adverse to a present and former employee of Lennar Homes; therefore, it argues it is directly adverse to Lennar Homes as well. Of course, Lennar Corp. has no standing to seek to disqualify the firm based on a purported conflict affecting Lennar Homes. Lennar Corp. cites to a limited line of cases outside of Florida finding that counsel can raise ethics issues, even if they lack standing. That is not the law in Florida. Here, non-clients generally do not have standing to seek attorney disqualification based on a conflict unless (1) that party "stands in the shoes" of the firm's client, *see THI Holdings, LLC v. Shattuck*, 93 So. 3d 419, 424 (Fla. 2d DCA 2012); (2) "the conflict is such as clearly to call in question the fair or efficient administration of justice," *see* Rule 4-1.7 cmt.; or (3) the rights of that party may be compromised, *see Davis v. S. Bell Tel. & Tel. Co.*, 149 F.R.D. 666, 673 (S.D. Fla. 1993). None of those exceptions applies here.

Even if Lennar Corp. had standing, it cites no authority finding that an action against an employee is directly adverse to its employer, especially where the employee is not being sued in his capacity as an employee of that employer. The one case it does cite, *Avacus Partners v. Brian*, No. 11101, 1990 WL 6576 (Del. Ch. Jan. 23, 1990), does not support Lennar Corp.'s claim that a suit against an employee can be directly adverse to its employer. In that case, the firm did not represent a client in any suit against an employee or former employee but rather represented a partnership that challenged the validity of a merger. The court found that the action was directly adverse to another firm client, a corporation, because that client played an important role in the merger. In other words, the firm would be required to take action directly against the corporation, its own client. The corporation's *employees* were not at issue.

11

## IV.   DISQUALIFICATION IS NOT WARRANTED

In its Reply, Lennar Corp. responds to the firm's position that, even assuming a technical conflict of interest (which the firm disputes), under *Prudential Ins. Co. of Am. v. Anondyne, Inc.*, 365 F. Supp. 2d 1232 (S.D. Fla. 2005), disqualification is not warranted. Lennar Corp. addresses just two of those factors and claims that they actually support disqualification.[10]

Lennar Corp. asserts that the nature of the ethical violation weighs in favor of disqualification because the duty of loyalty is at issue. Were that sufficient, a violation of Rule 4-1.7 would require disqualification. However, that is not the case. *See Great Am. Ins. Co. v. Gen. Contr. & Constr. Mgmt., Inc.*, No. 08-cv-21489, 2008 WL 1994857 (S.D. Fla. May 6, 2008) (finding disqualification was not mandatory, despite firm's violation of Rule 4-1.7). Lennar Corp. ignores the firm's argument that any purported conflict here is, at most, highly attenuated based on a prior representation of an affiliate.

Lennar Corp. concedes that any prejudice it would suffer if its motion were denied would be "negligible," and asserts that, because the firm recently appeared in this action, the Plan Trustee will not be prejudiced if it were granted.[11] Even if Lennar Corp.'s description were accurate (which it is not because the firm has represented the Plan Trustee in the TBW Bankruptcy since 2011), this factor would hardly weigh in favor of disqualification.

## V.   CONCLUSION

Accordingly, for the reasons set forth in this Sur-Reply and in the firm's Response, Berger Singerman respectfully requests that the Court deny the Motion to Disqualify.

---

[10] Mr. Fox asserts that disqualification is warranted but does not address any of the *Prudential* factors.

[11] The court in *In re Agway, Inc.* noted that the absence of any real prejudice to the movant leads to a suspicion that the motion is being pursued "solely to obtain a tactical advantage." No. 02-bk-65872, 2005 WL 3806043, at *5 (Bankr. N.D.N.Y Dec. 9, 2005).

12

Dated: January 29, 2013
      Miami, Florida

Respectfully submitted,

s/Elizabeth B. Honkonen
Richard H. Critchlow (FL. Bar No. 155227)
rcritchlow@knpa.com
Elizabeth B. Honkonen (FL. Bar No. 0149403)
ehonkonen@knpa.com
KENNY NACHWALTER, P.A.
201 South Biscayne Blvd, 1100 Miami Center
Miami, Florida 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861

*Counsel for Non-Party Berger Singerman LLP*

## CERTIFICATE OF SERVICE

**I certify** that on January 29, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Elizabeth B. Honkonen

## SERVICE LIST

Edward J. Peterson, III, Esq.
epeterson@srbp.com
STICHTER, RIEDEL, BLAIN & PROSSER, PA
110 East Madison Street, Suite 200
Tampa, FL 33602
Telephone:	(813) 229-0144
Facsimile:	(813) 229-1811
*Counsel for Plaintiff Taylor, Bean & Whitaker Mortgage Corp.*
**[VIA CM/ECF]**

Patrick E. Geraghty, Esq.
pat@7-litagators.com
GERAGHTY, DOUGHERTY & EDWARDS, P.A.
Post Office Box 1605
1531 Hendry Street
Ft Myers, FL 33902-1605
Telephone:	(239) 334-9500
Facsimile:	(239) 334-8930
*Counsel for Plaintiffs Federal Deposit Insurance Corporation and Taylor, Bean & Whitaker Mortgage Corp.*
**[VIA CM/ECF]**

Hilarie Bass, Esq.
bassh@gtlaw.com
Adam M. Foslid, Esq.
foslida@gtlaw.com
Timothy A. Kolaya, Esq.
kolayat@gtlaw.com
GREENBERG TRAURIG PA
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone:	(305) 579-0500
Facsimile:	(305) 579-0717
*Counsel for Defendants Lennar Corporation, U.S. Home Corporation, and North American Title Company*
**[VIA CM/ECF]**

Sharon L. Kegerreis, Esq.
skegerreis@bergersingerman.com
James D. Gassenheimer, Esq.
jgassenheimer@bergersingerman.com
BERGER SINGERMAN, LLP
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone:	(305) 755-9500
Facsimile:	(305) 714-4340
*Counsel for Plaintiff Taylor Bean & Whitaker Mortgage Corp.*
**[VIA CM/ECF]**

Michael H. Delbick, Esq.
Orlando Villalba, Esq.
MORTGAGE RECOVERY LAW GROUP
700 N. Brand Blvd. Suite 830
Glendale, CA  91203
Telephone:	(818) 630-7904
Facsimile:	(818) 630-7920
*Counsel for Plaintiff Taylor, Bean & Whitaker Mortgage Corp.*
**[VIA U.S. MAIL]**

Theodore L. Tripp, Jr., Esq.
ttripp@hahnlaw.com
Justin B. Mazzara, Esq.
jmazzara@hahnlaw.com
Kevin Patrick Fularczyk, Esq.
kfularczyk@hahnlaw.com
HAHN LOESER & PARKS LLP
2532 East First Street
Fort Myers, FL 33901
Telephone:	(239) 337-6700
*Counsel for Defendant Matthew Devereaux*
**[VIA CM/ECF]**

Gregory W. Kehoe, Esq.
kehoeg@gtlaw.com
Greenberg Traurig, P.A.
Courthouse Plaza
625 East Twiggs Street, Suite 100
Tampa, FL 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900
*Co-Counsel for Lennar Corp., U.S. Home Corp., and North American Title Company*

Anthony P. Strasius, Esq.
anthony.strasius@wilsonelser.com
Rachel F. Kelman, Esq.
rachel.kelman@wilsonelser.com
WILSON, ELSER, MOSKOWITZ, EDELMAN
 & DICKER, LLP
100 SE 2nd St, Suite 3800
Miami, FL 33131
Telephone: (305) 374-4400
Facsimile: (305) 579-0261
*Counsel for Defendants Anthony Gizzi Real Estate Appraisals, Inc. and David Sawyer*
**[VIA CM/ECF]**

David A. Wallace, Esq.
dwallace@williamsparker.com
Williams Parker Harrison, Esq.
dfernandez@williamsparker.com
DIETZ & GETZEN, P.A.
200 S. Orange Avenue
Sarasota, FL 34236
Telephone: (941) 366-4800
Facsimile: (941) 954-3172
*Counsel for Defendant Andrew J. Sorensen*
**[VIA CM/ECF]**

Julie White
240 S. Main St.
Salt Lake City, UT 84101
**[VIA U.S. MAIL]**

Kelly A. O'Keefe, Esq.
kokeefe@bergersingerman.com
125 S. Gadsden Street, Suite 300
Tallahassee, Florida 32301
*Counsel for Plaintiff Taylor, Bean & Whitaker Mortgage Corp.*

Riverwalk Property Ventures, LLC
c/o Ayla Burnett
c/o Charles Burnett
PO Box 93
Clifton, ID 83228
**[VIA U.S. MAIL]**

Ayla D. Burnett
PO Box 93
Clifton, ID 83228
**[VIA U.S. MAIL]**

Charles M. Burnett
PO Box 93
Clifton, ID 83228
**[VIA U.S. MAIL]**

15

Kelly Hatch
1138 W 2100 N Street
Pleasant Grove, UT 84062
**[VIA U.S. MAIL]**

Utah Exchange Group
c/o Ayla Burnett
c/o Charles Burnett
PO Box 93
Clifton, ID 83228
**[VIA U.S. MAIL]**

Kelly Hatch, individually and
Manager for Aspen Home Loans, LLC
440 Brandt Court, Apt. 10
Salt Lake City, UT 84107-2301
**[VIA U.S. MAIL]**

Michael Riley Moore, Sr.
432 S 1045 W
Orem, UT 84058
**[VIA U.S. MAIL]**

Jennifer White a/k/a Jenifer Cherrington
310 Winecoff School Rd
Concord, NC 28027
 **[VIA U.S. MAIL]**

Aspen Home Loans, LLC
c/o Kelly Hatch, its Manager
1138 W 2100 N Street
Pleasant Grove, UT 84062
**[VIA U.S. MAIL]**

Paul Andrew Gulbronson
4528 Fairloop Run
Lehigh Acres, FL 33973-6036
**[VIA U.S. MAIL]**

Peggy Ferguson
1712 Whitwood Lane, Apt. #2
Campbell, CA 95008-2542
**[VIA U.S. MAIL]**